18-1067 United States v. Fluvio Flete-Garcia and 18-1116 United States v. Fluvio Flete-Garcia Good morning, your honors, if it pleases the court. Mark Shea for Mr. Garcia. Really what this case is all about, it's very fact specific, obviously, but it is about the integrity of the courts, the integrity of evidence, and the evidence that was used in the sentencing of Mr. Garcia is not reliable. And I showed very clearly it's not reliable. And while Judge Sorokin is a fine jurist, he made clear error here, and he also abused his discretion in not giving us the ability to call witnesses. And what I'd like to point out is that, as I tried to do in the brief, is the problems with the integrity of the evidence just don't go away, and the government doesn't deal with it at all. And in fact, they kind of double down on it within their brief, where they say, they defend and assign inaccuracies that are factually unsound and legally irrelevant. That's just not true, respectfully. You know, the things I have pointed out are sound, are accurate. They were the ones who were inaccurate at the hearing, and then had to file something post-sentencing to say that they were inaccurate. And those checks, the Dupin-Gonzalez checks, are critical because they go not to just the integrity of the evidence, but they go to the conspiracy itself, meaning the whole idea of the conspiracy is that my client's filing, well, with Mr. Santiago, having tax returns filed, then accumulating these checks that are real, meaning the check that's created is supposed to be a legitimate, accurately dated check. But I showed, and it's Supplemental Appendix 143, I think there's over 30 checks from Dupin-Gonzalez that the dates are tampered with, which means it doesn't fit with it. When you say tampered with, I think what you're really, all that you're really saying is that at the bottom of the check, in an apparently pre-printed sequence, there's six digits that correspond to a date, and that date doesn't confer to the type of date that is at the top of the check. That's right. Why should we infer that means any tampering? You have an unstated premise that those two dates should be the same on all checks. That's not an unstated premise. That's what the government filed post-hearing in agreement. It is supposed to correspond. Now, I agree that my stated premise that they're stolen, and I can't prove, that's part of why you allow me to have witnesses, right? So what I can say is that it doesn't fit with the charge conspiracy, right? Because the charge conspiracy would be that the two dates would match, and then he would bring it to the check casher, and the check casher would just cash it. There's no need to tamper with the dates if it's a legitimate U.S. Treasury check gotten in the way that the conspiracy charged. So it means it doesn't fit within the conspiracy. It means they did something different with these checks. One has to ask, why did they have to alter these checks if they came as a result of a tax return? When you say they had to alter these checks, what evidence is there in the record as to who made these alleged alterations? No, there's no... So this doesn't come up at trial. No, but you... And so the record would be that I found it in going through the records, and going through the checks. And so then I had to make representations to the court because I wasn't allowed to call witnesses. And what it means is it doesn't fit the conspiracy. That's the critical... And these 30 checks total how much? I would say roughly they were about a third of the Gonzalez amount, and he's $750,000, so roughly a quarter million. But here's the point I'm trying to make. Even if those checks don't represent losses attributable to the conspiracy, that doesn't change anything as far as the offense level calculation of sentencing. Yes, it does, because it changes the entire conspiracy. And here's what I... Wait, let me respectfully point out something else. So there's two exhibits the government relies on, the exhibit two and three for intended loss. Exhibit one, which they used in both the PSR and the sentencing memorandum. Now I went through exhibit one in preparation for this argument, because that's in evidence. And I have copies if the court is interested that I marked and I shared with my assistant. And here is... These are in the record? Yes, they are in the record. And the copies have the supplemental appendix number on the and it's... I nearly lost my sight going through these last night trying to find this. So I anticipated that the government or your honor was going to say, well, why don't we just eliminate the Gonzalez checks? But here's the problem, is that the entire conspiracy is called into question. And when you look... So this is exhibit one. This is supposed to be the cleaned up actual loss that the government... And now you're saying that this means he's innocent? I am saying... We're at... Well, no, I understand... We're at sentencing, right? You're talking about a sentencing issue. I am. And so at sentencing, you still have to accurately have had accurate records. Right. So hence Judge Selyer says that, well, even if we throw out all of these checks that you say were fraudulent, then you're still way over the amount that's relevant for the guideline sentencing enhancement. Well, Judge, respectfully, if you look at page one, which is special appendix 49 on what I just handed up, what I've highlighted, and I provided this to my sister, is that there are three social security numbers there that are used by two different individuals, a total of six people. And this, I believe, is from Ms. Dominguez. And what this means is that in the same year, they were filing tax returns using the same social security number with different individuals, and this was counted against my client. Now, one could simply say, oh, well, eliminate those checks. He's still overwhelmingly over. That's not the point. The point is that Santiago testifies at the trial with my client, gives him an identity and a social security number, and he is to make one tax return with that identity and that social security number. Now, what's your premise about where these checks come from and why they exist? Well, see, this is the problem, Judge. I'm left, respectfully, making things up because I'm not sure... So what is it you would have us make up? Okay, what I would have, well, what I would really have you do is send us back to the court so we can have a hearing with real evidence and real witnesses and real agents. Yeah, but you had a hearing before the guilty plea was entered. You had an opportunity to cross-examine on this, and your client presumably made a knowing decision when to stop the trial and enter the guilty plea. So I don't see, number one, how you can argue that you had no chance, in effect, to cross-examine or get in relevant evidence. And number two, I don't see how you can stand there and argue about an absence of evidence or contradictory evidence when, in fact, your client has already entered a guilty plea. Well, first off, I didn't represent him at trial, and I've argued... That doesn't make any difference. No, no, no, I know. It does make a difference because, as we've argued on a brief, his lawyer was ineffective. But that issue isn't relevant on direct appeal. Well, in ineffective assistance to counsel claim, our precedent says bring it by 2255. It does, unless it was... Unless the record is fully developed below. Right, and the record as to the ineffective is fully developed at least... Do you have the testimony of the prior attorneys? No. Well, then the record's not fully developed. Well, here's what I would suggest on that, though, is if... See, what I'd like people to do, respectfully, is somebody to actually look at what happened here. If one looks at the exhibits, you can see that this lawyer, trial lawyer, didn't even look at the exhibits because the exhibits don't line up. Yeah. And so... Counsel... Are we getting to the point where we don't expect trial lawyers to look at exhibits? Mr. Sherrod... Yes. As Judge Salia has pointed out, we consider the ineffective assistance of counsel issue generally under 2255, unless the record is developed. The defense lawyer, who you say was ineffective assistance of counsel, has not even testified. There's not even an affidavit. There's conversations between him and your client reflected in the record that we don't know what was said. So, if you really want to spend your time arguing the Strickland... No. I don't. All right. I was trying to answer the question. Then I would suggest you get back to the answer of the question, which is, given that he pleaded guilty, given that he had a chance to question all the government's case and deed, watched the majority of it, what is your premise about these checks that should cause us not only to disregard these checks, but then to disregard all the other evidence that he put guilty to? For instance, in paragraph 12 of the superseding indictment, the government wrote, once an individual return is filed using a valid social security number, the IRS will reject a second return filed using the same social security number. That's what they put in the indictment. That, what I just put before you, which is the government's exhibit at sentencing and in the PSR, shows that to not be true. And you had an opportunity to contest the PSR, or your predecessor did. And did not do so on this point. No, and I did contest the PSR, and I said that there were duplicative checks, and I wrote extensively on the fact that social security numbers were used more than once. That, like on the intended loss filings, I showed that the same social security number was used in the same year five times. So, the way that the numbers were generated against my client were just an outrage in terms of not being any more close than what he was charged with under the indictment. But again, we go back to Judge Salyer's point, even if we assume that the government was not simply wrong on the fact that they could process the same social security number twice, and therefore take your preferred preference that we should, that those duplicative checks somehow, the second version of it must be fake, even if we disregard all of those, you know, the relevant amount. That's your problem. And so you need us to treat this as sort of like the 13th chime on the clock. You not only know it's wrong, but you think everything else is wrong as well. And you haven't presented an argument to that effect. Yeah, well, respectfully, we're not well over. Because if you actually start to apply what the government's theory was, that Fletcher Garcia got checks, right? What's Fletcher Garcia's role is to pick up the checks, essentially. He's got someone who's creating the tax returns, and he's got people getting rid of the checks for him. That's the charge. So his role is to pick up the checks. And the government is clear that he has to have essentially dominion and control over those addresses, right? But if you look at the intended loss, if you look even at Exhibit 1, there are checks from all over New York. On the intended loss, there are checks in Alaska. There is no way that that's consistent with the government's theory that Mr. Fletcher Garcia controlled the addresses where he picked up the checks. That's why they created exhibits showing a P.O. box, showing things in Massachusetts, local to Lawrence, Andover, right? And actually, if you look at all of the extraneous stuff, tens of millions probably go out. And we would be left with... Out of the 12 million? I would say that... Tens go out? I would say out of, yeah, I think we're down to about 10 to 2 million. And your clients are with money by the government? No, no. What I mean is that my client, we would say 10, I would say 10 million goes out. I would say it's a very... Let me ask you this, Mr. Shea. Mr. Shea, did you ever below present to the court a list that showed, here are the checks that we think are fraudulent because there's a corresponding date, putting to one side why a criminal would want to alter a check to make it look fraudulent. But take all of those, take the ones with duplicate security numbers, take ones in addresses that you don't think fit the scheme, and that adds up to over 3 point something million dollars. Did you ever do that calculation for the court? I didn't do the... Yes, and not specific, but I was having to... Would you cite us in the record where it is you did that? No, no. Because I didn't see it. No, I didn't. What I did was I said, there are all these checks from New York. There are all these checks from California. I pointed out that anything that wasn't in Massachusetts should be eliminated. Yes, I did point that out. Did I do a specific calculation? No, because I was... It's hard to capture that I was on the run, right? I was trying to do a lot of evidence at once. And on those checks, Your Honor, respectfully, you're saying, I don't know why anyone would alter a check to make it look fraudulent. Those checks, if you look at them, don't look fraudulent. They look like real U.S. Treasury checks. If the dates are supposed to match on real checks, why would someone change one of the dates so they didn't match? No, Your Honor, you're missing, I think, the point. It looks as if someone had access to Treasury checks that they accessed sometime after the original print date at the bottom. And so then they filled it in professionally at a later date. There's no reason for them to want to have two different dates, because that should call attention to it at the bank, but it didn't. Well, that shows that they may not have been very smart, but what else does it show? It shows that it doesn't fit the conspiracy of Fleta Garcia. It's critical to that. He would have just gotten a legitimate check and gone down. But on your own argument, at least two million of the losses could indeed be attributed to the theory, exactly consistently with the representations that the government made about how it works. Except that the government has taken no interest in the truth of what's going on here. I point out that Ms. Dominguez, one of their critical witnesses, is scanning checks that have been at the Bank of America, already deposited by the bank, and no one takes any interest. I'm pointing out a fraud on the court, a fraud. I mean, no one wants to look at the fact that the cooperating witnesses... You now say this is a fraud on the court? I've looked at this record. There was never an argument made in the district court on behalf of your client that some fraud on the court was involved. Well, then you can't argue it on appeal. No, I did argue it. You didn't? Actually, you just argued it. No, no. Meaning, at sentencing, I used just about that exact language. Respectfully, Judge. I do think that actually the government quotes me in its brief saying something about fraud. And it's my argument on due process. Saying something about fraud is different than saying there's a fraud on the court, which is a specific legal theory. No. I mean, this case is about fraud. No, no. What I mean, Judge, is that also the integrity of the evidence is called into question. I have shown that there are massive problems with the integrity of the evidence. And I am saying that I am hoping that the court... I have yet to be heard, and maybe it's my own lack of coherence. But I have tried to point out, and what I'm putting before you today, is that these social security numbers aren't being used in the way that the government charged in the indictment. And they're being counted against my client at sentencing when it calls into question the entire conspiracy. Excuse me. If the defendant trains Individual A and gives Individual A an apocryphal social security number that may be a real number but that is unauthorized for use and tells him to file a return and go through a procedure to generate a fraudulent treasury check, and the individual makes multiple uses of that fraudulently given social security number, isn't your client criminally responsible for that? Well, that would go in the face of what Santiago testified to. That doesn't answer my question. Because when you say, as you say over and over again, well, some of these social security numbers were used five times, all I'm saying is once your client sets this scheme in motion, if some of his co-conspirators get overly enthusiastic, he's not off the hook just because they go beyond what he would have deemed prudent. If that were the scheme, meaning it calls into question the entire scheme. And what I'm trying to say here is that the judge found Santiago reliable and that we didn't have to have Santiago testify because he believed that Santiago, and this was the testimony from both the government and Santiago, that Santiago didn't use the list, didn't self-help with this particular list. I thought Santiago testified. Didn't Santiago testify? That's right. Right, and you had a full chance to cross-examine him on everything, on any check, any double social security number. He was exposed to the full thrust of cross-examination. If the lawyer had looked at the records, he might have been able to do it. Well, now you might be at 2255 and maybe you'll have a good case on that. No, I'm just... See, we have to presume that he was adequately represented, that after sitting there for four days and hearing the government's case and knowing what he knew, your client, with the advice of counsel and having been braced by the court, pleaded guilty. Judge, they didn't ask a single question of Mr. Adams, Agent Adams, who is the person who did the intended loss, which is so full of holes that it boggles the mind. And not a single... I think your time is up. Yes. Thank you. Thank you. May it please the Court, Yael Epstein, appearing on behalf of the United States. With the Court's permission, I would like to just briefly clarify for the record how it is that the District Court made the determination of the loss in this case, because it derives from two conceptually distinct sources, which I believe my colleague conflates. Of the $12.7 million, $7.7 million of that loss is attributable to checks that were in fact negotiated through the defendant's co-conspirator's accounts at his direction. The remaining $5 million in intended loss relates to the tax refund claims that were made by defendant's co-conspirator Santiago at the defendant's direction using the stolen personal identifying information that the defendant provided to Santiago. Taking... And there's ample evidence that supports the District Court's loss finding with respect to both of those categories of information. Looking first at the $5 million loss attributed through Santiago, counsel points out that there are duplicates in this and that was improperly attributable to the defendant. But I would like to point out that this was intended loss. So the fact that there are several claims made on behalf of the same taxpayer for the same tax year is not entirely unreasonable. These were not paid out. And so it's eminently reasonable that the co-conspirators continued to submit multiple claims for the same taxpayer for the same tax year, hoping that one would stick. And in fact, there is evidence that that's precisely what they did. If we can focus on the sealed appendix, and I'll just give a couple of sites here. On page 83, there are two claims made on behalf of Hector Garcia, both requesting refunds for the same tax year, and both requesting refunds go to addresses that even the defendant would concede the defendant had exclusive control over. The 53 Meridian Street address with two separate apartment numbers. On that same page, there are additional two examples with respect to Rosado Agnes and James Lucia Edward, also showing multiple claims for the same tax year going to different variations of the defendant's 53 Meridian Street address. Counsel, if there are multiple claims referable to the same taxpayer for the same tax year, is it the government's position that it is proper to include all of those claims as part of intended loss, even though it may be unlikely that more than one would have been paid out? Yes, Your Honor, because it's intended loss, and they are clearly attributable to the defendant because they are directing that those tax refunds be directed to the defendant's addresses that he had control over. Even if the defendant, through his henchmen or his front people, applied for an unlawful refund, whether or not he was likely to get it, it still figures, in your view, properly into the intended loss calculation. Yes, Your Honor, under the definition of intended loss in the guidelines, we would. But each one of those requests was a request for a single refund. In other words, there is a record here of multiple requests, but the multiple requests refer only to one body of money. So it seems strange to say that if you ask three times for the same $5 bill, that you, in effect, are asking for $15 rather than asking for $5 three times. First, Your Honor, I think that with respect to the instances of duplicates, as my colleague points out in his brief, I think he identified 40-some instances out of the potentially 760, approximately, tax refunds that were claimed. So we're only talking about a small percentage here. And with respect to those duplicates, they're not asking for the same $5 each time. There are variations on it where they request different amounts of refunds based on different income reported and different withholding reported. Okay, I did not realize that. I think that's the answer to my question. And that's in the sealed appendix at page 83, for example, page 86, for example, and page 79, for example. Thank you. So with respect to the argument that there's duplicates in the intended loss, those are properly included in the loss calculation, and the district court did not err in including them as part of it because the IRS calculated that there were, in fact, $5 million in claims made and accredited Santiago's testimony. And with respect to his argument that that $5 million included requests for tax returns to be sent to multiple addresses that are outside of the state, again, Your Honor, I'd like to point out a couple of things. One, the evidence showed that the defendant had access to numerous locations beyond Massachusetts. First, Louisiana. There was testimony by Santiago that the defendant had requested that certain tax refund claims be sent to Louisiana. There was also, as admitted at trial, undercover admissions by the defendant that he purchased treasury checks. And I would argue that the 7.7, the distinct loss that the district court also included with the checks that were actually negotiated through the defendant's co-conspirator's accounts, they listed addresses throughout the country. And significantly, even if we were of the $5 million, to limit that loss to checks only in Massachusetts and Louisiana, which the evidence showed and the defendant concedes that the defendant had access to, that would not change the defendant's guidelines calculation because the loss would still exceed $9.5 million by at least $100,000. So with respect to the remaining $7.7 million in loss, the district court also properly included this. The bank records established that $7.7 million in claims were made and negotiated through the co-conspirator's accounts. The IRS determined that each one of those claims matched a false tax return, and the co-conspirators had testified that these checks were negotiated at the defendant's direction. So the defendant's challenge with respect to the issue dates, as Judge Kayada had already pointed out, it's unclear why it would be that the defendant would try to make what is a legitimate treasury check look fraudulent, but whatever meaning that was ascribed to the bottom of the check, the fact remains that the issue date on the top of the check and the deposit date that is notated on the check show that there was no fraud, even in the small sample of checks that my colleague has identified at the sentencing hearing and identifies on appeal. So the district court did not clearly err in finding by a preponderance of the evidence that the loss as calculated included both the fraudulent treasury checks that were negotiated through the defendant's accounts, as well as the intended loss. With the court's permission, I would like to talk about the number of victims enhancement. The district court did not clearly err in enhancing the defendant's sentence by two levels, pursuant to 2B1.1 to B2A, because the offense involved more than 10 victims. Section 2B1.6, which prohibits an enhancement for the transfer, possession, or use of a means of identification for an individual who is also sentenced under aggravated identity theft, does not preclude an enhancement for the number of victims. At its most basic, the two-level number of victims enhancement is applied for exactly that, the number of victims. And of course, we recognize, as we must, that a victim is only a victim in this case, as defined by the guidelines, because their means of identification were used. But that alone, that finding, while sufficient, while a necessary finding in order to apply the enhancement, is not sufficient to trigger the application of the enhancement. Section 2B1.6, at its most basic, is an anti-double-counting provision. That's what the guidelines say. It is concerned with punishing a defendant who is subject to the two-year mandatory minimum under 1028A, under aggravated identity theft, with punishing that individual for the same conduct by enhancing an underlying offense of conviction. But a single instance of aggravated identity theft is just that, a single instance. It in no way captures that there might have been numbers of victims, dozens, hundreds, thousands of victims. And the additional finding that needs to be made in order to trigger the enhancement, the number of victims, is one that this Court has already found meaningful. For example, this Court has had the occasion to consider the 2B1.6 provision in United States v. Jones. There, the defendant was convicted of bank fraud and aggravated identity theft. At sentencing, over the defendant's objection, the District Court applied a different enhancement, not the number of victims enhancement, but a different enhancement found in 2B1.1 v. 10, which is now in v. 11, that provides for a two-level increase for the trafficking or the production of a means of identification. And in that case, this Court had construed 2B1.6 narrowly, and held that while the provision may include an enhancement based on trafficking, at least when that just involves transferring, it did not preclude an enhancement based on the production of a means of identification. And that was a harder question than the one presented here, because if this Court determined that production of an unlawful means of identification was not a specific offense characteristic for the transfer of possession or use of a means of identification, then certainly a number of victims' specific offense characteristic is not for the transfer of possession or use of an unlawful means of identification. And that's precisely what each of the Court of Appeals that have addressed this issue have determined. The number of victims enhancement is not for the transfer of possession or use. As the Tenth Circuit recently put it in Gonzales, it's for the extent of the crime. Or as the Sixth Circuit put it in Lyles, it's for the impact of the crime. The Third, Fourth, and Eleventh Circuits have also addressed this issue, and consistent with this unanimous precedent and this Court's reading of the provision in 2B1.6, the district court properly enhanced the defendant's offense level because this crime victimized hundreds of individuals. Counsel, before you complete your argument, can I ask that you turn your attention to the restitution award? Yes, Your Honor. In defending the offense level enhancement, you've pointed out quite correctly that the sentencing court had a considerable cushion because it found the combined actual and intended loss to exceed the $9.5 million threshold necessary for the offense level enhancement by over $3 million. So that even if there is some play in the joints, some calculation error or unreliable evidence, and we subtract that out, we're not going to come close to that threshold. But restitution operates differently. And the same figures were used to justify the restitution award. Isn't that so? Yes, Your Honors. As an initial matter, we believe that the standard of review in this case is plain error for the restitution because we do not believe that the defendant preserved the argument on restitution. After it was imposed, he did not object on that basis. But in viewing the basis for the restitution order, the district court based it on only the $7.7 million in checks that were actually negotiated through the defendant's co-conspirator's accounts. That was based on the IRS's summaries, and that was based on the testimony of the co-conspirators that that loss was attributable to the defendant. So the intended loss didn't figure into the restitution order at all? Precisely, Your Honor. And nothing that the defendant has raised with respect to the $7.7 million loss undercuts the fact that at the end of the day, these checks were in fact negotiated at the defendant's direction. Testimony of the co-conspirators that the district court explicitly credited. Thank you. That's helpful. Absolutely. One of the other arguments that my colleague raises is with respect to his argument that he was improperly denied a hearing. And I just want to point out for the record that it's true that he moved pre-sentencing for a hearing, but as the district court found when it rejected that request, it was not based on any specific evidence at that time. He offered no specific support for his sweeping attacks on his request for a four- to eight-hour hearing. Those are the district court's word. It's not mine. Record 242. In that same order denying the hearing, the district court did note in a footnote that should it become an issue during sentencing hearing, anything that he would necessarily want to hear additional information on, he would certainly entertain it. And at sentencing, after the defendant presented his evidence and again asked for a hearing, the district court reiterated, and if I just may read for the record, that prior to the beginning of the hearing, and this is at the Joint Appendix No. 799, at the beginning of the hearing I saw no basis whatsoever for an evidentiary hearing. Now you've submitted, nothing you've submitted seemed to create a general issue of material fact or an issue of disputed fact that in any way required a hearing. You are now raising things that you have never raised before because all the defendant's arguments that he's advancing today were advanced only at the beginning of the sentencing hearing. Whether that requires additional testimony is an open question, the district court noted. And the district court rightfully wanted to give the government the opportunity to address those concerns to determine whether or not he ultimately needed to take additional testimony to decide the questions before it. And ultimately after hearing the defendant's arguments and the government's response, the district court rightfully concluded that it didn't need additional testimony. At the end of the day, it was clear that $12.7 million in claims were made. That came from IRS summaries. And in attributing all that to the defendant, the district court explicitly credited the testimony of the co-conspirators who have already testified at trial and were already subject to cross-examination. So it concluded that there was nothing in the record before it that it needed to take additional testimony on or that would move the needle one way or the other. And it didn't abuse its discretion in denying the defendant that hearing. The defendant also attempted to withdraw his guilty plea. As the court pointed out, it was not error for the district court to deny the defendant the opportunity to withdraw his guilty plea. It was both knowing and voluntary. And as Judge Kayada pointed out already, it was made after a thorough rule unequivocally that followed a trial where the government presented the vast majority of its evidence. If there are no further questions, we respectfully request that the judgment be affirmed. Thank you, counsel. He did not observe any rebuttal. This session of the Honorable United States Court of Appeals is now recessed until April 2019. Court is closed and we will have a session with our student visitors in a moment. Thank you. Thank you.